Good morning, Your Honors. May it please the Court, my name is Matthew Bishop. I represent the plaintiff's appellants, the Pryors Coalition et al. in this matter. I'm going to try to reserve five minutes of my time for rebuttal by May. As you know, this case is a challenge to the Forest Service's new travel plan for the Pryor Mountains in south-central Montana. The Pryors Coalition et al. is a very unique and diverse group of local hunters, backcountry horsemen, conservationists, and even former Forest Service and BLM employees, including the former state director of the BLM and the former district ranger for the Beartooth Ranger District at issue in this case. I'd like to spend my time this morning on three issues, each of which touch on the alleged legal violations. The Pryors Coalition's case alleges violations of the National Environmental Policy Act, or NEPA, the Forest Service's 2005 travel rule, and the executive orders which are codified in the 2005 travel rule. First, what is the proper baseline or starting point for an environmental analysis like this in these travel cases? That's important because it forms the no-action alternative in the EIS at issue in this case. The parties agree that properly defining the no-action alternative is extremely important for that reason, because it provides the basis from which all alternatives and their impacts, including the chosen alternative, are compared. So just about every analysis, every finding, every discussion and table in the EIS compares the chosen alternative against the no-action alternative. Mr. Bishop, can you help me? As I understand it, with regard to the route designations of the Forest Service roads, there was an issue presented as to whether or not these were pre-existing system roads, is that correct? That's correct, Your Honor. But as I reviewed the record, they had actually been assigned Forest Service road numbers, and isn't that the indication that a road has been so designated? Not necessarily, Your Honor. In order to be sort of a system route or road, there is some sort of decision that is made, a formal decision on the part of the Forest Service to include that route in the travel network. And that decision is usually made with some public input, usually a certain level of planning, oftentimes usually an environmental analysis, and usually a map as sort of the end result of that process. That's part of the reason why they're doing so much here. If it was simply putting numbers on tracks, they certainly wouldn't have to go through this entire EIS process. Well, I guess we can assume safely that if a route does not have a number, it's probably, I forget what that term is, but basically the user-created two-track. Yeah, maybe an ATV goes off on its own and that becomes some kind of a pathway. That's exactly what happens. Right. And then someone else follows the track. And that one's not going to have a route number unless and until it is designated under the procedures that you talk about, right? That's correct, Your Honor. Okay. But I guess that gets me back, because you do challenge some of the decisions that were made with regard to routes that already had been numbered. Well, yeah, the major concern here, and this goes to the no-action alternative, is that we allege, based on the evidence in the record, that there are approximately 57 miles of these user-created two-tracks in the prior mountains that were never part of the previous 1987 travel plan or mapping, but that were mistakenly included in the no-action alternative, and therefore the Forest Service incorrectly assumed that they were part of the baseline and part of the starting point. Well, I guess the question I would have for you is when, if the record shows, were the route numbers assigned to these user-created two-tracks? Yeah, that's a great question. So based on, in sort of preparing for this hearing, I had an opportunity to go back and read all the briefs and look at the record, and that was sort of the big mystery in this case was how did these 57 miles of routes all of a sudden become system routes? And what happened was, and this is outlined in the federal government's briefs on page 34 to 35, is that in 1999 they actually went out and did an on-the-ground survey of this current situation to look at what was system and what was non-system. And based on that on-the-ground survey, for some reason the Forest Service mistakenly put a lot of these illegally-created two-tracks in the system, in what they call the infra-database, it's an infrastructure database, and called them system routes. But it wasn't a decision document. It was just an assessment of the on-the-ground situation. And from that decision, from that sort of infra-database, I think that's what they used to form the no-action alternative in this case, and that's where the mistake was made. So if I can restate what you just said to make sure I understood it. The survey team assigned route numbers sort of for their own convenience, but didn't follow the normal procedure for designating a route. That's right. They were looking at what was on the ground and said, well, we see some two-tracks over here. And instead of sort of saying maybe documenting that as a non-system route because it wasn't in the current travel plan in existence at that time, for whatever reason they gave it a number and called it a system route. And so in the mid-2000s, when this particular plan was being finalized, the Forest Service looked at those route numbers and said, well, they're pre-existing because we know about them and they're here and we've given them numbers. Yeah, they basically said, these are already system routes, so they're pre-existing routes, we have the route numbers, so therefore we don't necessarily need to analyze. We're not changing the status quo, because it's already a system route. But our concern is, well, it wasn't actually a formally designated system route, just someone made a mistake and put it in the infra database and automatically we have a system route that was never sort of submitted for public review and comment, environmental analysis, et cetera. So, you know, at the end of the day, we feel like that mistake, which resulted there were sort of 57 miles of these routes in the fires, all of a sudden I've never really been subjected to any kind of environmental analysis because, again, the Forest Service put them in the no-action alternative. So what regulation would be violated when the Forest Service did that? Well, the primary violation would be under the travel rule of 2005 travel regulations, and that's 36 CFR 212.55, both A and B. B actually pertains only to areas and trails, and a lot of these usually created tracks or trails, and the regulation says that in designating these specific, there's a sort of specific criteria, you know, in designating these trails for motorized use, they should consider the effects on, you know, damage to soils, vegetation, wildlife, et cetera. So that was never done, and I also, Your Honor, I would say that. You say it was never done? Excuse me? Why do you say it was never done? Well, I think based on the record and opposing counsel's statements in their briefs, their argument is that it doesn't need to be done because it was part of the existing status quo, and therefore they weren't making any changes. And what we allege, Your Honor, is it actually was not part of the status quo. It was mistakenly included, and therefore it's a new designation. Wouldn't that be true for other roads that, for want of a better term, were grandfathered in long before there was even a system route designation program? Yeah, well, I think if you have an existing, let's say a lot of existing routes, if they were designated before as part of a travel plan, I would concede that if there was some public input and some environmental analysis, it would be entirely redundant. No, I'm going back even further than that. I mean, this forest was created in what year? You know, that's a good question. I mean, I think it goes back many decades, and there must have been roads into portions of this forest that were probably provided numbers and used for egress and ingress for decades. Yeah, I mean, Your Honor, the earliest travel plan we have for this area is from 1965. And the forest is older than that. It's older than that. So I guess there's no indication in the record, I take it, that this went through the public process that you're talking about that we now go through. Well, there was one in 1987. I'm going back to 1965. I'm still on my grandfather hypothetical. No, Your Honor, you're right. I mean, back in 1965 they made a brochure and said, here are the routes that are open. But since then, you know, the laws have changed. We now have NEPA. And the travel rule in particular was really designed to rein in the increase in motorized use but still provide access for motorized on the forest, which I think is important, but at the same time balance that against some of the other resource concerns. I think in particular there was a lot of these user-created routes that were showing up on the ground, and the Forest Service really wanted to kind of rein that in. At the end of the day, you know, the Forest Service has the discretion to designate those user-created routes into system roads or trails and to open up areas for off-road car camping, as they did in this case. But in order to do that, they have to go through certain hoops. They have to make sure that they take a hard look at what the impacts of that decision are. In particular, you know, on soils, native vegetation, wildlife, as outlined in the travel rule. And would that be true for permittees like mining companies and logging companies that are going to be extracting resources from the forest lands? Well, they would be required to sort of use the existing road prism, but they're also going to obtain special use permits. Well, but I assume they would also be creating their own routes, would they not, in order to get from the nearest public road, so to speak, to, let's say, the mine, or to a particular timber sale that doesn't currently have existing roads? So they could always add a new temporary roads. They could certainly do that, and that would be part of the environmental analysis for that particular project. So the dilemma for the Forest Service here is to try and figure out how we take a multiple-use federal land that has to encompass resource extraction, recreation, and environmental concerns, and sort of balance them all out in a plan that makes sense. It's a difficult—no question, it's a difficult job, Your Honor. And you're asking us to declare that what the Forest Service did here was arbitrary and capricious, and we should overturn it, the record that's set? That's right. The reason I'm not—I want to make sure that, you know, this isn't sort of a fly-specking of a large EIS. The concern here, and my clients, this is the very first time they've ever followed a civil action, is there's a really important area of the Pryor Mountains called the Big Pryor Plateau. It's like a tabletop mountain. This is the 8,000-foot elevation. Yeah, it's really amazing. You can see the northern Wyoming. You can see all the way throughout eastern Montana. But in that situation, the Forest Service's decision actually designates 13, a little over 13 miles of new motorized routes. Not all of them are new. And then also opens up almost 1,000 acres to off-road car camping and driving, in this very sensitive, special place to my clients, where there's secure elk habitat, sensitive soils, et cetera. So I'm not saying the Forest Service can't ultimately do that. But if they're going to make that decision, they have to take a very careful, hard look at what the environmental consequences are going to be. And that's the importance, I think, of NEPA and the travel rule, is to say, here's a special place. I'm not saying they have to do it necessarily on every route by route. But here's a really special area. It's important elk habitat. Before you make that decision, take a close look at what the impacts may be. And I think the record in this case, Your Honor, reflects that they just didn't do that. They didn't, you know, for instance, on the soils issue, they didn't even bother to take one soil sample from the Big Pryor Plateau, let alone the areas that were open for motorized use. Was it the Carbon County? There was a soil study that had been done many years before. There was apparently a 1975 Carbon County soil survey that they did. But they didn't provide that in the EIS or even summarize its findings. And it's not in the record. Opposing counsel did provide a link to the survey, which is on a USDA website. But it's referenced in the record of decision, is it not? The link in the survey is referenced, but the information it contains is not in the record and not in the EIS. So we honestly don't know if any soil samples were taken, for instance, on the Big Pryor Plateau. And if so, where? Does that soil survey indicate whether or not any samples were taken from this area? Your Honor, I haven't been able to even read it or see it. I tried to spend some time on the website when I was briefing to prepare for the argument. I was unable to actually print out a copy to know. And when the clients were able to do it, you couldn't get down to the scale to know if it really included the Big Pryor Plateau. And opposing counsel, I think, notably hasn't said that it does. So we don't think they took any soil samples from the area that they actually authorized for motorized use. And when the public actually raised concerns, my clients raised a lot of concerns over soils and commenting, they said they prepared a soils assessment report and the analysis will be in there. But we now find out there's no soils assessment report either. So it's sort of a general vague statement about soils in general, but there's nothing really helpful or useful in analyzing the impacts of soils, say, in the Big Pryor Plateau. And I think that's what we really... I think that what makes this case more like... less like McNair, Lands Council v. McNair, and more like this Court's decision in Lands Council v. Powell, and more recently in the Northern Plains Research Council case, where the methods they use just don't result in any kind of useful analysis and they're entirely unreliable because they don't even know what the soil types are in this area they're opening for motorized use. And that's one of our major concerns in this case. You know, looking at the clock, I think I need to reserve a lot faster than I thought. That's all right. Thank you. Absolutely. We'll hear from the government. Thank you. Alan Bravender with the Department of Justice on behalf of the federal defendants. With me at the council table today is Mr. Paul Turk, who represents the recreation groups, and we'll be splitting time 15 minutes for myself, 5 for Mr. Turk. Very well. It is important to understand that Mr. Turk and I, while we're sitting at the same table, we do not have the same interests. His clients are also very unhappy with the Forest Service's decision here, as it significantly reduced opportunities for motorized recreation in the Pryor's unit. I don't think we've ever had a case where everybody was happy with what the decision maker did. Right. And certainly everybody isn't happy here. But that does not mean the Forest Service violated the law. In designating routes for motor vehicle use, the agency considered the criteria from the Travel Management Rule and considered the significant impacts of its decision under the National Environmental Policy Act, which is known as NEPA. Now, first let me address this so-called factual dispute regarding what the impact of the decision was, whether it increased motor vehicle use or decreased it. And I should say it doesn't really matter whether the decision increased or decreased motor vehicle use because neither the Travel Management Rule nor NEPA impose any substantive requirement on the agency, but rather simply consider the consideration of impacts as a procedural matter. Now, the parties, the plaintiff uses a different baseline than the Forest Service. The plaintiffs used the 1987 Travel Plan set in stone. The Forest Service, however, explains why the 1987 Travel Plan cannot be used as the baseline in the EIS. There are several problems with the 1987 Travel Plan. First, the plan did not attempt to identify all system routes in existence in 1987, rather designated only a subset of system routes for motor vehicle use. Second, the 87 Travel Plan designated an unknown number of miles of routes. The plaintiffs throw out this number, 92 miles, but the Forest Service doesn't know where the plaintiffs get that number. The fact of the matter is the 1987 Travel Plan doesn't say how many miles of routes it is designating. The third problem is the 87 Travel Plan was adopted prior to satellite technology and GIS technology. Rather than the precise maps or descriptions that we use today, in 1987 they used vague descriptions to identify the routes that are being designated. And from these vague descriptions, it's impossible to tell which routes are being designated and even more importantly, which segments or lengths of routes are being designated. The fourth problem is the 1987 Travel Plan doesn't reflect changes to the system made since 1987. So the Forest Service used as a baseline the 1987 Travel Plan plus all the changes made since 1987. And perhaps the biggest... Up until what date? 1987 to 2004? To 2008. The biggest problem with the 1987 Travel Plan is it was never implemented. The general rule is public lands are open for public travel unless specifically closed. Open unless closed is the general rule. The 1987 Travel Plan represented the first attempt by the Beartruth Ranger District to designate a system of routes for public use and then prohibit off-route use, pursuant to the Executive Order 11-644. But before the routes could be closed pursuant to the 87 Plan, the 87 Plan required several things to be done. A public map needed to be distributed to the public so that they knew where they could travel and where they could not. A system of white arrows needed to be constructed in the forest so the public again knew where it could travel and where it could not. And those routes that were closed, they needed to be physically barriered or signs needed to be posted informing the public that they could not travel upon that route. This was not only an aspect of the 1987 Plan, it was an existing federal regulation that required the posting of a route before somebody could be convicted of trespassing upon that route. So the problem is, and for whatever reason, probably due to a lack of resources, the 1987 Travel Plan and the route closures were never implemented. The 1987 Travel Plan was not enforceable. The plaintiffs in their reply brief attach a 2004 scoping document, which the Forest Service used to inform the public that it was going to prepare a new travel plan. It's page SER Roman numeral 2001 attached to their reply brief. Has there been a new one developed since? What has happened since the 1987 Plan? Well, the 2008 Plan was adopted, and that plan provides enforceable route closures. And that is not before us? That is the decision that is before the Court, is the 2008 Travel Management Plan. So this document, SER 2001, is administrative record document B35. And on the first page of the document, which the plaintiffs provide this Court, it says the 1987 Travel Plan is legal and enforceable. But on the next page, which they do not provide to this Court, it says, it talks about the problems with the 1987 Plan and the need for a new plan in order to enforce the route closures. I would also refer this Court to the white paper published by the Forest Service on this subject in 2007, which is found at Supplemental Excerpts of Record, pages 755 to 758. So while the 87 Plan provided legal authority to close routes, the Forest Service never exercised that authority. Then in 2001, the Forest Service issued what is known as the Tri-State Off-Highway Vehicle Decision, which prohibited off-route cross-country travel. It required motor vehicles to stay on a route, either system or non-system route, but allowed persons to leave a route for 300 feet to reach a campsite, which is known as the Dispersed Vehicle Camping Rule, which I should note the 1987 Plan also has a 300-feet Dispersed Vehicle Camping Rule. Then in 2005, the Forest Service promulgated the new Travel Rule. The Travel Rule required the consideration of certain criteria in designating routes, but it also provided new authority for the Forest Service to enforce travel restrictions. As mentioned, prior to 2005, in order to enforce a route closure, knowledge on the part of the user needed to be established and a sign needed to be posted closing that route. Since 2005, the Forest Service is now able to enforce the travel restrictions on a strict liability basis, as long as the travel plan is promulgated pursuant to the 2005 regulations and as long as a public map is distributed. And the 2008 travel plan is promulgated pursuant to the 2005 regulations, and also there is a public map of the 2008 decision. So the pre-existing condition in 2008 was that motor vehicle use was occurring on routes such as 2095A on the Big Priors Plateau. Whether it was a system route or a non-system route, it was occurring, and dispersed vehicle camping was allowed within 300 feet of any route. What this 2008 decision did is for the first time provide an enforceable travel plan. It reduced the system miles from 150 prior to 2008 to 125 after the decision. It imposed strict seasonal limitations on motor vehicle use on 58 of those 125 system routes, and it closed 27 miles of non-system routes that were being used lawfully by people prior to 2008. And correspondingly then, the decision also reduced motor vehicle use for dispersed vehicle camping. So there's no question that this decision significantly reduced motor vehicle use in the prior years. So is the fight basically over we want more than what you've restricted? That is exactly the fight. The plaintiffs are, they want certain routes on the Big Priors Unit closed. Make this clearer for me. What is it you are seeking? You want additional routes closed? That is what the plaintiffs want. We just want the Forest Service's decision to be upheld. It should be noted that significant public debate preceded this decision. There was a large portion of the public, Mr. Turk's clients, who demanded increased motor vehicle opportunities. There was another portion of the public, represented by Mr. Bishop, who demanded decreases. The Forest Service did its best to accommodate both sides, but there was going to be tradeoffs, and clearly neither side is happy here. I understand the Forest Service motivation. Essentially you want your rangers to be able to issue tickets to people who are caught on routes that are closed, and so you have provided appropriate notice and warning to the traveling public. But that doesn't really address the question of whether or not the forest supervisor adequately considered the environmental issues in deciding which routes to close and which to leave open, does it? Well, NEPA is a forward-looking document, so you have to gauge what are the physical impacts on the ground at the time. And the physical impacts were occurring prior to the agency's decision. They were not caused by the agency's decision, so NEPA wouldn't require the agency to consider those impacts. But the fact of the matter is the agency did so here, even though they weren't required to do so. In each analysis, the agency stated the impacts under each alternative in the aggregate. And Alternative B Modified, the impacts for Alternative B Modified, include motor vehicle use on routes such as 2095A. So even though the Forest Service didn't need to do the analysis, it most certainly did so, and the analysis is not arbitrary or capricious. I think you're taking your colleague's time. I think I have four and a half minutes, but if you think I should sit down, I will. There is a number of issues raised by the plaintiffs regarding the specific NEPA issues. If the Court has any particular concerns about any of the analysis, I would be happy to address. Could you address the soils analysis challenge? Sure. So when we're talking about impacts on soils, we're talking about sedimentation. That was addressed in the Water Quality section. We're also talking about the ability of soil to support vegetation. That was analyzed in the Vegetation section. In the Soil section, what we're talking primarily about is erosion. And so to gauge the erosion risk on each route, the Forest Service used its resource specialists, first of all, to go in the field to identify if there were any resource concerns. And if there were any resource concerns, the agency noted them. It also used its GIS technology with input from, among other sources, the National Resource Conservation Service's website and data, which includes the Carbon Colony Soil Survey. Now the NRCS is the authoritative source on soils in the United States of America. Soil resource specialists from all over the United States, the agricultural industry, the civil engineers, they all use this website to gauge soil data in a particular area. Just as lawyers would go to Westlaw, soil specialists go to this website. There's no indication that the information from the NRCS website was unreliable. Because it is relied on by so many people, it is in fact vigorously checked for reliability. There's no obligation on the part of the Forest Service to go out and actually collect soil samples from the priors unit. As long as the agency's analysis and methodology is reliable, that is all that matters. So are you representing to us that there are soil samples or analyses that have been done in the priors unit in the past that are listed in the registry? Right. So I can't say whether or not any soil samples were taken from the big priors. That's the argument I heard, is that you didn't do that. No, but they were taken in Carbon County. And based on the scientific methodology... Right. Right. And based on the methodology... You still can't tell me whether or not we have done any, that anyone has ever taken a soil sample from this particular part of the priors. Right. But they have taken soil samples from other parts of Carbon County and extrapolated that information using scientific processes, which I don't understand, to make a reliable survey. I would encourage this court to go upon the website that I provided this court a couple weeks ago. It's remarkable the amount of data that you can get from even the priors unit on this website. You think that's going to help us resolve? I mean, it sounds to me like sort of scientific stuff that we are probably ill-equipped to assess. Just to the extent that it gives you comfort that the agency's methodology was reliable here, and it was reliable. It used NRCS data, which soil specialists use throughout the United States of America. And unless this court has any other concerns about the... I don't think we have any other questions. I will yield the remainder of my time to Mr. Turk. All right. Very well. Mr. Turk? Thank you very much. May it please the court. I just want to address one argument that Mr. Bishop made, which is essentially that the no-action alternative was improperly defined, that they included these routes like 2095A in the system, and that as a result, the analysis was never done. They were essentially kind of given a free pass from the NEPA analysis. I want to emphatically disagree with that assertion, and I've thought about the best way to try to explain that. And I think the best way is to look at the alternatives that were considered. And specifically, Mr. Brabender covered this in his brief at page 12 and 13 of the bottom page numbers. It explains how there were alternatives. Basically, there were alternatives that would not have designated many of these routes. So I don't want to make light of this issue, but frankly, the baseline wasn't that important. And the no-action alternative is typically not a viable option, at least in a plan like this. I mean, the agency is going to designate some network of routes, and the point here is that they looked at a range of options for designating the routes, including, as the pages I cited describe, alternative C, quoting from the brief, largely reflected a proposal submitted by the coalition and would have provided for motor vehicle use in about half of the prior unit. In other words, it would have essentially created an almost non-motorized area or even more non-motorized area in this big prior plateau area. Well, maybe this is too simplistic, and I'm sure you'll correct me if I'm wrong. As I understand the no-action alternative, it's essentially status quo. We're not going to make any change from the current uses that are being made. And it seems logical to me to conclude that that would involve both numbered and unnumbered routes, whether user-created or a road that was built and never given a number. In this case, I think that's correct, and I think that's why it, you know. But that wasn't the choice that the forest supervisor chose. Absolutely not. And, in fact, in these travel planning decisions, the no-action alternative is dead on arrival. I mean, that's, you know, even my clients realize that continuation of the status quo is not a viable option. So that's my point. I understand the intellectual argument that that's the baseline to which you compare alternatives. But, again, let's remember NEPA is a disclosure statute. It's not a substantive statute. So the degree of those impacts at the end of the day is not necessarily important under NEPA. And the point is the analysis got done here because there were other alternatives that didn't have those routes on them or had variations. And so, as a result, when you look at the spreadsheets that were created and all the specialist reports and all the, you know, facets that make up the kaleidoscope of the NEPA analysis, every route got looked at and every resource got looked at. And I guess that's the main point I want to make. And at the end of the day, this was a very thorough analysis on, in the context of Forest Service travel decisions, a relatively small project area. So it got a very thorough look, and at the end of the day, it's a look that the plaintiffs are dissatisfied with. And I just don't think we can expect the Forest Service to do much better than it did here, and we would ask that you affirm their analysis. Well, as I understand it, their real concern focuses on the 1,000 acres in the plateau, and the priors itself is, what, 29,000 acres? I think it's more like 74. 74,000 acres. And then that, in addition, is part of the Beartooth Ranger District, which covers, what, another 500,000 acres? The Beartooth is, yeah, is a much more. And about 65% of that is designated wilderness area. Correct. Okay. All right. Unless anybody has. All right, I think we will give Mr. Bishop the final word. Thank you. I'd like to just make a few quick points on rebuttal. One is that the soils issue is extremely important, and I think, you know, the photos in the record from the prior mountains really depicts the magnitude of the problem. That's an excerpt of record. Oh, go ahead. Excerpt of record 359 to 360 really show what the soil concerns are in this area, and it's not erosion. It's compaction. It's people driving off roads, especially early in the season when the area is wet and when the native vegetation is coming up. But I thought they imposed seasonal restrictions in order to address that, and specifically in this most sensitive area of the plateau, did they not? Actually, Your Honor, they did impose a seasonal use restriction, but their own biologists recommended that they not allow people to drive in this area until mid-June, June 15th. And they opened it up, what, before Memorial Day? They wanted to make sure, May 22nd, they wanted to ensure that people could drive up in this area on the Friday before Memorial Day every year. Okay. Can you address the point that government counsel made with regard to this NR, I'm not sure I got it right, NRSC national database that is the guru of soils analysis? Yeah, Your Honor, what he's referring to, I think, is one of the national soil surveys that were done, but I keep coming back to the fact that we don't even know where those soil samples were taken as part of that survey, and whether or not they even included the sensitive areas that my clients are really concerned about. I thought the representation was that the soils management specialists turned to that database in order to obtain the data that they needed to look at in connection with this decision. That's what I heard him say. Yeah, I think what's hard about that is we haven't seen the data. The data's not on the record. It's not in EIS, and we don't even know, and they haven't actually argued, that the data comes from the area we're really dealing with, which is the big prior plateau. Well, I think what he said was you were able to extrapolate based on the information that's in that national database. Right. We haven't been able to see it, and I think it's important for that information at the very least to be on the record, Your Honor. I'd like to jump quickly to the no-action alternative argument that Mr. Turk made. This Court has held, and a long line of cases have held, that alternatives analysis is really the heart of an EIS, and it's really important for the agency to properly define the no-action alternative because it is a starting point. But isn't it the status quo? Am I being too simplistic in saying that? Your Honor, in this case it really isn't. The status quo was alternative A, which was sort of the lawless existing condition of user-created tracks and system and non-system. The no-action alternative, they define very clearly in the EIS as the 1987 travel plan, the pre-existing travel plan, as modified or amended. And we agree with that definition. We just don't agree that some routes that they went out and did a field inventory on and put on there for database should really qualify as system routes in this case. And that mistake really undercut the entire analysis in the EIS, we believe, in this case. I'd also like to make one point that even if we assume they're right and they're correct, that a lot of these user-created tracks were already somewhere at some point in time authorized. It's really important to keep in mind that they were never subjected to NEPA before, and they were never subjected to the travel rule analysis, which is really important. So they're really like the ways and roads and airstrips that were at issue in this court's recent decision up Missouri Breaks National Harbor. But that goes back to my earlier question about grandfathered routes. I mean, there's no question that those routes were not subject to NEPA either. NEPA probably didn't exist when those routes were designated. No, but most of those routes were part of the 87 plan, which was done with public input. They had public hearings. They had opportunity for people to weigh in. You know, even some of my clients were around back then and participated in that process. In fact, one of my clients was a district ranger who helped develop and sign that plan. So there was a process. I don't think they didn't do NEPA, but there was an opportunity there. And the other thing is, you know, for now, for the first time, you're going to have a lot of these tracks that are going to be mapped. They're on the sort of travel map. They're going to be signed, and they're going to be open for motorized use for the first time officially. Well, some are going to be open, and some are going to be closed, and some are going to be subject to seasonal use restrictions. Well, that's correct, but at the end of the day, there was a significant, what we believe, a significant increase from the old plan to this new plan, increased a lot of motorized use in the prior mountains. And we feel at the end of the day that process matters, that the Forest Service should have taken a hard look before making that decision. Not to say they can't, but before they do so, they should look before they leave. All right. Thank you all very much. The case just argued is submitted, and we will be adjourned. Thank you.
judges: O'connor, Tallman, Bea